Alonzo RICHARDS, Plaintiff,

v.

I. B. M. CORPORATION, Defendant.

No. 79–73510.

United States District Court,
E. D. Michigan, S. D.

Jan. 22, 1981.

Gary Benjamin, Reosti & Papakhian, Detroit, Mich., for plaintiff.

Joseph A. Ritok, Jr., Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

ANNA DIGGS TAYLOR, District Judge.

Plaintiff filed his complaint in propria persona on September 11, 1979. He had been hired by the defendant corporation in September of 1968 and discharged on January 11, 1978. His complaint of race-based employment discrimination was filed with

the United States Equal Employment Opportunity Commission on January 18, 1978; and that Commission's Right to Sue letter was dated May 15, 1979, and indicated that "No reasonable cause was found to believe that the allegations made in your charge are true as indicated in the attached determination." Plaintiff's complaint claimed a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

On December 10, 1979, defendant moved to dismiss plaintiff's complaint for this court's lack of jurisdiction inasmuch as plaintiff had filed suit an alleged 104 days after receipt of his suit letter. After hearing, the court denied the motion on the basis of plaintiff's affidavit that he did not actually receive the Equal Employment Opportunity Commission letter until June 16, 1979. Post office receipts and notices which were received in evidence were self-contradictory in their dates. Thereafter, plaintiff, through counsel, filed an amended complaint claiming this court's jurisdiction not only under Title VII but also 42 U.S.C. § 1981 and M.C.L. § 37.2101 et seq., the Michigan Elliott-Larsen Civil Rights Act. The court finds that its jurisdiction is proper.·

The amended complaint alleged, in substance, that plaintiff had been transferred by defendant in 1974 into a "Program Support" unit without the prerequisite training which was given to a subsequently hired white employee. He was retransferred, in 1975, back to his initial computer hardware responsibilities and not trained adequately for hardware. He was thereafter discriminatorily evaluated, and discharged. All of these allegations were denied by defendant's answer.

This case was tried to the court, which struck plaintiff's jury demand, for eight days commencing October 16, 1980. The court heard evidence on many events and matters which, although time-barred, were helpful as background in its examination of defendant's conduct subsequent to September 11, 1976. That date, three years prior to the filing of plaintiff's complaint, is the cutoff date of plaintiff's claims under 42 U.S.C. § 1981 and the Michigan Elliott-Larsen Act, to which the Michigan three year statute of limitations is applicable. Under Title VII, events prior to March 24, 1977 are barred, having taken place more than 300 days prior to plaintiff's filing of a charge with Equal Employment Opportunity Commission. See *United Airlines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); and *Trabucco v. Delta Air Lines*, 590 F.2d 315 (6th Cir. 1979). The events on which plaintiff's claim must be based are essentially, therefore, his final post-September 1976 evaluations and the events which led to his 1978 discharge.

Defendant made a motion to dismiss, pursuant to Federal Rule of Civil Procedure 41(b), at the close of plaintiff's case. The court denied that motion, inasmuch as the inclusion of any racially discriminatory factor in an employment decision is unlawful; and inasmuch as plaintiff's testimony, viewed favorably to him as the non-moving party, had implicated the factor of race as a consideration in his discharge, and had therefore made a prima facie case on the preponderance of his evidence which would withstand such a motion.

The court finds, however, that plaintiff has failed to make the prima facie case on the preponderance of all of the evidence which is required in such an action: and, moreover, the defendant has articulated legitimate business reasons for all of its actions relating to plaintiff, which reasons have not been demonstrated to have been pretextual for racial discrimination. Accordingly, the applicable law, discussed below, requires that this court dismiss the plaintiff's complaint.

This suit alleges that plaintiff was treated differently and less favorably, or disparately, by defendant, because he was black. At the least, his claim is that race was a factor (and an impermissible factor) in defendant's allegedly less favorable treatment of him than of similarly situated white employees. Accordingly, his case is to be measured by the line of employment discrimination cases adjudicating "disparate treatment" claims, as opposed to those of "disparate impact."

The court notes that conclusory allegations have been made that defendant's facially neutral performance planning, counselling, and evaluation system has resulted in a racially disparate impact. However, no evidence of such an impact has been presented. No other black employee has been demonstrated to have sustained any adverse or disparate impact from that system. There is also no evidence that the system is unlawfully subjective, under *Rowe v. General Motors Corporation*, 457 F.2d 348 (CA 5, 1972). Indeed, the unrebutted testimony of James Crump, Manager of Equal Opportunity for the I.B.M. General Systems Division, and a black, was that supervisory evaluations and decisionmaking are well surrounded by guidelines, outer parameters, recordations at every level, linear review procedures, EEO reviews and finally a company "open door policy." A disparate impact claim is still governed by the law of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

▆ A critical factor to a prima facie case in disparate impact cases is the need to identify a particular practice or device, such as the performance evaluation system of this defendant, and to establish a causal relationship between that practice and some statistical disparity which is alleged to have resulted. As outlined by the court in *Neloms v. Southwestern Electric Power Co.*, 440 F.Supp. 1353, 1369–70 (W.D.La.1977):

> In attacking a specific practice or selection device, the plaintiff may prove the discriminatory effect of the practice or device by the use of statistics .... The burden only shifts, however, once the plaintiff has shown the disparate impact of the particular test or device in question. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977); *United States v. Georgia Power Co.*, 474 F.2d 906, 911 (5th Cir. 1973) .... In other words, the mere disparity, without same causal connection, is not sufficient to shift the burden of proof to the defendant. There must be some proof that the disparity resulted from the practice or device in question.

In this case, the court finds that no disparity has been shown, as a matter of fact, and that the system is not susceptible, as a matter of law, to plaintiff's claim of disparate impact.

▆ In a claim of disparate treatment, a Title VII plaintiff must prove a prima facie case by a preponderance of all of the evidence (quite apart from the Rule 41(b) standard of a prima facie case), which "consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." *Mosby v. Webster College*, 563 F.2d 901 (8th Cir. 1977). The well-known four part test of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1971) is to be applied. A prima facie case may also be made by "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those acts were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The same standard is applicable to a plaintiff's case under 42 U.S.C. § 1981; and under Michigan's Elliott-Larsen Act, M.C.L.A. 37.2101 et seq. See, *Grano v. Department of Development of the City of Columbus*, 637 F.2d 1073 (CA 6, 1980).

As the court stated in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> ... "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical*, although it can in some situations be inferred from the mere fact of differences in treatment.... Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involved employment

practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra*, at 349 [, 97 S.Ct. at 1861]. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. Compare, e. g. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–432 [, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158] with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–806 [, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668] 431 U.S. at 335 n. 15, 97 S.Ct. at 1854. (Emphasis added.)

█ When a court concludes that a Title VII (or 42 U.S.C. § 1981 or Elliott-Larsen) plaintiff has proven a prima facie case of either disparate treatment or impact, then the court must consider defendant's explanation or justification for the presumptively discriminatory action or practice. The type of defense that the defendant must then articulate depends upon the type of claim asserted by the plaintiff. In a disparate treatment case, the defendant must articulate "a legitimate nondiscriminatory reason" for his action. *McDonnell Douglas, supra.* In a disparate impact case, the defendant must present evidence that the challenged test, procedure, or requirement, bears "a manifest relation to the employment in question." *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977), quoting *Griggs, supra;* unless the procedure in question is encompassed within a statutory exception. See *Teamsters, supra.* In either case, the burden of going forward is then placed upon the defendant to articulate a nondiscriminatory rationale. Thereafter, the plaintiff may still prevail if he can, finally, establish by a preponderance of the evidence that the apparently nondiscriminatory rationale which was articulated by the defendant served only as a pretext for the in fact discriminatory acts or practices in question. See *Board of Trustees of Keene St. College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

█ As aforementioned, plaintiff has presented no disparate impact of evidence. Accordingly, the court's examination of the facts of record is narrowed to the question of whether he was treated disparately and less favorably than similarly situated whites by defendant and its agents because of his race. The facts found herein demonstrate that he was not.

Plaintiff attended the Detroit public schools through the ninth grade, and then became a career member of the United States Army. In 1949 he obtained a General Equivalency Diploma and subsequently took college-level courses in machine repair, transistor theory, and some liberal arts. His last eleven years in the Army were spent as a Radar Technician; and he retired in 1968 at the rank of Master Sergeant.

Plaintiff then returned to Detroit to seek the second career which he had planned, in business machines. He was referred by the Michigan Employment Security Commission to the I.B.M. Oak Park Office where he was interviewed, given aptitude tests, and hired by the field manager in September, 1968.

Defendant sent plaintiff away to its basic training school in machine (or "hardware") repair and service work, and he returned thereafter to work as a Customer Engineer (or "CE") in the Oak Park Office, where he remained until 1972. His initial rating, given by his instructor after the first three-month adjustment period, was satisfactory. The instructor noted that plaintiff was weak in mechanical diagnostics. Plaintiff testified that he agreed with that comment, because he had had limited prior experience in mechanical diagnostics.

Plaintiff was given a copy of a booklet enumerating defendant's standard of Performance for a CE, and there is no dispute as to the duties involved. A CE is given an assigned territory in which he diagnoses and repairs I.B.M. equipment failures on a variety of I.B.M.-serviced hardware, at the customers' establishments. He performs preventive maintenance services and is expected to develop and implement plans to maintain optimum system continuity, to ensure customer satisfaction. Installations and discontinuances are also his responsibility; and inasmuch as management and technical support service is not immediately

available to him on site, he must require no more than minimal assistance to complete his tasks. An experienced CE's technical responsibilities generally include a wide range of hardware complexities, inasmuch as his territory is predetermined not only by his specific machine training, but by geographic considerations. It is also clear that the CE must maintain a high level of awareness and sensitivity to customer needs, plans, and satisfaction, as they relate to I.B.M. products. He is to advise management and marketing personnel of problems, as appropriate and necessary to maintenance of satisfaction.

In 1972, as the result of a territorial reorganization, plaintiff was moved with the work he was performing to the Detroit Metropolitan Office. In 1973, he expressed a desire to be promoted to the position of Program Support Representative (or "PSR"). That job entails responsibility for customer satisfaction with I.B.M. software, or programming systems. Among the specific duties which a PSR performs are program installation, defect verification, and application of "temporary fixes" to override program problems pending generation of a new approach. In addition, the PSR provides on-site assistance to customers or to other I.B.M. personnel for diagnosis of programming or hardware problems, and provides branch office support level service for assigned machines.

In 1974, after learning of plaintiff's expressed desire to become a PSR at a Managers' meeting, and because he wanted a minority for the third of the three PSR's allocated to him, Field Manager Robert Young selected plaintiff to become a PSR under his management. He testified that he had initial doubts because of adverse feedback about plaintiff's diagnostic abilities, and about the capabilities of all those in the Oak Park Office; but because he wanted a black, in conformance with defendant's Equal Employment Opportunity policies, he selected plaintiff.

In November, 1974, plaintiff was promoted (with a pay increase) to PSR. He had already acted informally as a PSR trainee for several months, while training to become qualified in software.

Promotion to the PSR position represents a chosen fork in the career path of an entry level CE. One route of vertical advancement from the entry CE position is through positions requiring greater hardware expertise and experience, into higher Technical Support levels. Alternatively, a CE may seek advancement with I.B.M. by accumulating software expertise, starting with a promotion to the position of PSR. Plaintiff's testimony was that his hardware knowledge, gained from six years as a CE, became totally useless to him during the year that he worked on Program Support and was accordingly forgotten. Therefore, his claim is that he should have been retained as a CE when his hardware responsibilities were resumed in November, 1975; and that defendant's failure to totally retrain him was unlawfully discriminatory. The court is unable to credit that testimony or claim. The court finds, as Manager Young credibly explained, that CE experience is invaluable to a PSR because hardware knowledge assists in recognition of program problems, knowledge of machine functions, and in furnishing a language of communication about machines. Indeed, since 1974, all PSR's have been drawn from the ranks of CE's because of the advantages of that experience. Moreover, the court cannot credit the claim that six years of experience is washed away by one year of work on a different facet of computer science.

After promotion to PSR, plaintiff became the newest and least experienced of the three under Young's management. He was also the only black. Young testified that plaintiff was hesitant to get involved with the more complex systems such as the System 3, or to even accompany the more experienced men on their complex calls. They complained to Young of plaintiff's avoidance of complex situations. Plaintiff, on the other hand, who acknowledged in his testimony that he had technical deficiencies and problems, said that they divided the work among themselves and he always wound up with the least complex. He accepted no responsibility, in his testimony, for personally elevating his level of expertise.

Young testified, and the court finds, that plaintiff failed to utilize, or profit by, a number of learning opportunities while in this position. After completion of PSR training, Young permitted him to audit classes which were held for customers at the branch, to try to understand the machines. There were also available in the office, daily until midnight, machines and field self-instruction manuals for the more complex machines, including the 5496 machine which caused great grief to the plaintiff in this last years with defendant. However, he "never had a chance" to work and train with the available instruction models. Plaintiff agreed, at trial, that all of the machines which caused his problems were covered by "Field Instruction Courses" in the office. At his deposition he admitted never having picked one up: at trial he denied that fact. The court is unable to credit that denial. When Young advised plaintiff that he would send him to training school on System 3, Model 15, the court finds that plaintiff told him there weren't yet enough machines on the market to justify training. Again on this subject plaintiff has given contradictory rationales, neither of which is helpful to his case. Even if the court were to credit his trial testimony that he actually told Young that he did not want to be confused with too much training too soon, the fact remains that plaintiff never willingly participated in any learning experience as a PSR. Eventually, Young had him concentrate on the System 3, Model 6 machines.

Young testified that plaintiff was too often in the office and idle, rather than out servicing his customers. Plaintiff's response was not a denial that he was in fact often in the office; but was testimony that most of the job is in the office, because so many customers' unnecessary and lazy questions must be answered with telephone calls.

During 1975, plaintiff claims to have been discriminatorily denied a transfer opportunity to a CE position in Los Angeles. The court credits Young's testimony on this subject, which was that plaintiff did not have the requisite machine expertise to be recommended for the position.

Young gave plaintiff three appraisals during the year of his supervision. The first, which was given during the training period, noted that plaintiff "consistently exceeded" requirements. That fact refutes plaintiff's claim that Young had "stereotyped" him from the inception of their relationship, and treated him disparately and less favorably solely because of his race. The court finds that Young started with high hopes for plaintiff's future as a PSR. However, the subsequent appraisals rated plaintiff at the lowest satisfactory level, and repeatedly noted shortcomings in the areas of "oral and written communications", self-confidence, more "aggressive pursuit of developmental opportunities", more "self-motivation in seeking out work that needs to be done", self-study, initiative, etc., etc. The last of these was given in December, 1975, after plaintiff had transferred to his next manager. Plaintiff disagreed with this rating and appealed it to Young's manager Ruppaner, who discussed the matter thoroughly with plaintiff, but affirmed Young. Plaintiff argued that all of the above criticisms are no more than racial stereotypes, imposed upon him by Young out of the wholecloth and racial animus. The court cannot and does not make a finding as to whether the appraisals had total support in just cause in the I.B.M. context. It does find, however, that no disparate treatment had been demonstrated by a preponderance of the evidence to have occurred.

In October, 1975, I.B.M. marketed a new generation of computers: the System 32. They were smaller and simpler than prior systems, specifically designed for the small customer without a programming staff. The company was reorganized nationally so that System 32 software and hardware would both be serviced by CE's who would be trained in both areas of service. This constituted a major change in I.B.M. policy: and Young saw it as an opportunity for plaintiff, who still had technical problems with all more complex systems. Young was asked to designate two persons from his office for training on the system, and plaintiff had the prerequisite training on the

System 3, Model 10. Young testified credibly that he thought this training would give plaintiff the opportunity to move early into a new market and become an office expert in this relatively simple system, as the market expanded. Accordingly, Young designated plaintiff from his office to be sent to both hardware and software schools on the System 32. Thereafter, in November, 1975, plaintiff was given a System 32 software territory in downtown Detroit, with hardware responsibility as well. Plaintiff was designated a CE again, but sustained no decrease in pay. Indeed, he was given a raise every six months from his date of hire in 1968 until March of 1976.

Inasmuch as plaintiff felt at the time of his initial reassignment that he was too "rusty" on hardware to render CE services, his new Field Manager, Roger Holmes, initially assigned him for a period to the second shift, so that he could obtain a broad exposure to hardware problems and reacclimate himself without the usual added daytime burdens of preventive maintenance and maintenance of satisfactory customer relations. Holmes wrote on his periodic review that plaintiff's "weak communications skills have become apparent;" that he "has his hands full" managing a small territory; and that he needed to improve to show that he even met the requirements of the job. Holmes' comments were, as had been Young's, appealed to, reviewed, and concurred in by their manager Ruppaner.

In March of 1976, plaintiff was assigned a smaller-than-normal hardware territory with System 32 software as necessary, under the management of James Palmer. Holmes had been promoted away; but at a "turnover" meeting he told Palmer of plaintiff's apparent difficulties. The System 32 software problems had not materialized in the volume expected, and for that reason plaintiff's hardware territory included other machines, as well.

In October, 1976, and within the statutory limitations of the scope of this lawsuit, Palmer appraised plaintiff at the lowest satisfactory level. Again, weaknesses were noted in technical skills, "aggressiveness", communications skills, and use of available time. The evaluation noted the need to become a "self-starter", and project a more positive image among customers and peers. In short, plaintiff appears to the court to have impressed his fourth consecutive manager with technical weakness and minimal performance. The first customer complaint against plaintiff was received from City Foods in the fall of 1976. Palmer discussed it with plaintiff, who agreed that there was a problem and that he would resolve it.

By early 1977, I.B.M. had begun to receive serious customer complaints about plaintiff's performance, and Palmer grew concerned about their unprecedented number and severity. Several customers came to the office and asked that plaintiff not be sent back to their establishment. This never happened to any other CE, black or white, known to Mr. Palmer or known to the record in this lawsuit. By June of 1977, eight severe complaints had been lodged and Palmer, at the direction of his superior (from whom he had solicited advice) proceeded to investigate them by visits to the customers.

As a result of the severe performance deficiencies discovered in the course of his investigation, Palmer placed the plaintiff on I.B.M.'s standard I.B.M. "Performance Improvement Plan" on June 23, 1977, and completely discussed the plan and its expectations with plaintiff. He did not, however, give plaintiff an unsatisfactory rating at that time because he hoped to afford the improvement opportunity without first blemishing plaintiff's record. The court finds that Palmer's failure to then rate plaintiff as unsatisfactory was not, as plaintiff argues, racially disparate treatment.

The Performance Improvement Plan is part of the I.B.M. "Performance Planning, Counseling and Evaluation Program", and is designed to advise an employee of his perceived performance shortcomings and what improvements will be necessary to reach a satisfactory level. In plaintiff's case, he was advised of all specific customer complaints, the results of Palmer's investigation, and that his two problems were customer satisfaction and technical performance. He was told that immediate im-

provement to a satisfactory level of customer relations was required, in at least five specific areas: first and foremost, a perceived (by the customer) sense of urgency; then clear communications, conscientious follow-up, preventive maintenance and meeting commitments. Otherwise, he would be discharged at the end of the program. In the area of technical expertise, Mr. Palmer noted that plaintiff was still very weak but that improvement could be more gradual. No pressure was brought to bear in this area. Plaintiff acknowledged his technical shortcomings, and it was agreed that he would seek help as needed from the office technical support representatives because he felt it would be too embarrassing to have one travel with him. As will be discussed below, it appears that he did not seek such help. He was also to advise Palmer immediately of any problem with a customer which appeared to be beyond his own control. As discussed below, this was never done, either, although serious problems did thereafter develop. Plaintiff would be given no more raises and no more training on new machines until he reached a satisfactory level.

Thereafter, as planned, Palmer and plaintiff met almost weekly after July 1, 1977, to evaluate plaintiff's progress. After no improvement appeared to have occurred and more customer complaints were filed, Palmer rated plaintiff unsatisfactory and placed him on another 90-day program on August 26, 1977. Again, Palmer discussed his reasons and his expectations exhaustively with plaintiff. He told him, this time, that any additional complaints would result in immediate dismissal.

The program continued throughout the fall of 1977 without improvement in technical expertise or customer relations. Plaintiff was sick for a month, so Mr. Palmer extended the plan. During the month of December, Palmer assigned a Technical Support Representative to work with plaintiff almost full-time, despite plaintiff's reluctance at the embarrassment of being given visible assistance. Still yet no improvement was obtained. Old complaints remained alive and new ones continued to be lodged. On January 11, 1978, Palmer wrote his memorandum recommending plaintiff's termination. It was reviewed, discussed, and concurred in by Palmer's Manager (Rounds), a third-level manager (Kreutzberg), and the Regional Equal Employment Opportunity Manager for I.B.M. (Harrison).

The testimony and evidence concerning customer complaints and concerning the technical assistance and support which was given to plaintiff during his last year of employment, including plaintiff's *own testimony*, all militate to the finding which this court now makes that the discharge was not racially based, in whole or in part, and that the customer complaints which ultimately precipitated the discharge were not mere racial stereotypes, as plaintiff argues. Indeed, Mr. Palmer testified that he wondered whether the complaints were racial, although plaintiff never suggested that possibility to him, and he concluded as this court does that they were not, for the reason that all of the complainant customers had been or were thereafter serviced by other blacks, without complaint.

Plaintiff himself testified that I.B.M. began to place great emphasis on customer satisfaction when competitors which offered lower priced systems and service became a problem. Although plaintiff was indicating at the time that the emphasis was ill-conceived, in his opinion, he was also indicating that it was not disparately placed upon his shoulders alone. There is no dispute but that the customer satisfaction emphasis was company-wide, during all times relevant hereto. The record includes documentation of the same emphasis upon customer satisfaction as applied to a number of white CE's, whom plaintiff has pointed out as having been treated more favorably than he. Immediate improvement was required of them where any drop in the level of customer satisfaction had occurred. Also, the managers of the white CE'S, as well as plaintiff's manager, proceeded to communicate with the customers to ascertain their satisfaction. Although the whites in question were not fired as plaintiff was, the records indicate that they managed, at least during the period of examination, to eliminate their customer satisfaction problem.

By the end of 1976, Mr. Palmer managed fourteen CE's, four of whom were black. No other black or white employee was asked off an account or was the subject of so many complaints. Other black CE's serviced the same customers who complained of plaintiff; Lloyd Wilson, the office expert on the 5496 machine who assisted plaintiff on occasion, and corrected his errors, was never the subject of a complaint; and Clarence Pompey, the black who replaced plaintiff on 80% of his accounts, including all of the most vociferous grievers against plaintiff, two of whom testified at trial, was never the subject of a complaint. The complaints were not mere "stereotypical thinking."

Although plaintiff had a smaller territory than any other CE, Palmer testified that three service contracts were cancelled in 1977 under his management, and all were in plaintiff's territory. Plaintiff precipitated more complaints than Palmer had ever seen in his career: and his prior experience in contract cancellation had never exceeded one in one year.

Also, plaintiff's testimony reinforced Palmer's testimony that plaintiff had implied to him that he simply did not believe the customers' complaints, disagreed with each of the first eight which were discussed in detail on June 23, 1977, and with all others thereafter. Plaintiff suggested to Palmer, and to the court through his testimony, that nothing he had done on any of the occasions in question could or should have been done differently, or handled more tactfully.

Concerning the frequently repeated complaints that he had no sense of urgency about calls for service on down machines, plaintiff acknowledged that he did have problems scheduling his work to meet customer needs and schedules: but that the matter was simply beyond his control if the net result was that he could not finish faster or arrive sooner. He testified that he still saw no necessity to attend to a down machine before a closer vicinity call, because customers don't always really *need* the machine that is down.

In January, 1978, several months after Palmer had told plaintiff to attempt to assuage a complaint from Superior Towel, plaintiff advised Palmer that he had not been back there and was not going back, because they had made their mind up against him. Although he did not mention race as the reason to Palmer, his testimony was that he knew the customer was racist by the negative way in which the customer had looked at him. When black Clarence Pompey replaced him at Superior, there were no more complaints.

In spring of 1977, Co-Op Services complained that plaintiff spent an unsuccessful half-day on their down machine, announced his departure for lunch and left for 45 minutes, then returned for an equally unsuccessful afternoon. They felt that his lunch announcement was vindictiveness because he was annoyed by their questions. Yet plaintiff's response to Palmer and in testimony was a quiet indignation that he should be expected to even give the *appearance* to a customer that his mealtimes might be accompanied to their perceived emergency. To Palmer, and to the court, he acknowledged no other way of handling such a situation. Moreover, that customer's machine was still down the next morning and *nobody* came to finish the repair job. Plaintiff testified that the problem had gone away after 5:00 o'clock, so he had cancelled their service call. When the customer called the office the next day, another CE fixed the machine with a minor adjustment within an hour of his arrival. Co-Op Services had no complaints against subsequent black CE's.

On approximately August 1, 1977, when plaintiff was one hour late at John F. Ivory Movers by his own calculations, and two hours late by their calculations (because of an unexplained scheduling mixup), plaintiff testified that it was because his car's "brakes went out", and that it had not been possible for him to call either the office or the customer to explain the problem. That customer complaint, he felt, was again simply not his fault. It occurred during the first "Improvement Plan."

In August, 1977, plaintiff inadvertently closed-down the information system of Michigan Basic Property Insurance Association because, without announcing his intentions, he turned-off a machine on which a third-party contractor had placed a program. He took the position with the customer, with Palmer, and in his trial testimony that the resultant problem was simply not his fault. His inference at trial was that the customer had gotten his due for dealing with a third party. The customer told Palmer and testified at trial that plaintiff had become "very defensive," after his initial failure to communicate his plan had resulted in the setback; and that his "attitude" was more offensive than the initial error. Plaintiff has argued that reference to "attitude" reflected racial animus. The court rejects that argument, under the plain circumstances. The customer testified that he never complained about another black CE, although it was serviced by others. This event occurred during the first "Improvement Program:" and plaintiff has argued that Palmer utilized this one incident at Michigan Basic as a pretext on which to fire him for reasons of racial animus.

Montgomery Ward called the office in December, 1977, to ask that plaintiff not be sent back to their offices unless he brings help. It had no complaint of the other black CE's who served it.

Mr. Cobb, computer operations director of Wyandotte Hospital, testified that plaintiff was the only black CE whose actions compelled him to lodge a complaint with defendant. He was well satisfied by the service given by others.

Plaintiff further testified that 50% of his customers' problems were caused by operator error, which required "intense interrogation" of the operators; that many customers simply need "babysitting", and develop problems as a result of "laziness." He had a full explanation for the wrongheadedness of every complaint. The problems which admittedly developed in every instance raised by defendant were, in his estimation, no justification for complaint. Therefore, he argues, the complaints were all race-based, and were utilized for a race-based discharge.

The court may not and does not adjudicate whether or not the complaints and plaintiff's ultimate discharge were founded on just cause within the I.B.M. "law of the shop." It does, however, find and conclude that they and it were not demonstrated by a preponderance of all the evidence to have been founded upon any consideration of race, and were not unlawfully discriminatory.

Plaintiff's testimony concerning his problems in development of adequate technical expertise similarly reinforced and corroborated Palmer's. As noted above, when plaintiff resumed CE duties after one year of software experience, he took the position that he was too "rusty" to return to hardware without retraining. Although Palmer told him that he would not send him back to the same training programs which he had already once attended, he clearly made every effort to assist plaintiff in his technical problems, and did not penalize him for his very apparent slowness. Palmer had plaintiff list the machines which caused his problems, and there were four. Plaintiff had been formally trained at I.B.M. schools for all four; and all four were in the office with field instruction manuals. It should be recalled, also, that plaintiff took a second shift for several months after his return to hardware under Holmes to avoid customer contact while he warmed-up to hardware duties from March to August of 1976. At the turnover interview from Holmes to Palmer, both plaintiff and Holmes expressed concern that plaintiff could not fix the machines. In August of 1976, he went back to the day shift and was given a territory smaller than the other CE's were handling.

Palmer told plaintiff to utilize field instruction courses which were still available in the office until midnight, each day. Plaintiff never once signed-up for time on a practice machine or utilized a course. Also, although plaintiff told Palmer that he needed exposure to more complex problem-solving with expert help, he did not want to be

embarrassed by the assignment of a "TSR" to travel with him. His reluctance to ask for help was discussed at several of their regular improvement meetings. Accordingly, Palmer agreed that plaintiff was to call TSR Ross Fairman, as needed. Later, plaintiff told Palmer that he had never gotten help from Fairman; and although conflict also exists as to whether he ever asked, the record is clear that Fairman did assist him at least once, at Superior Towel. Also, although Palmer directed plaintiff to call him if he *ever* found himself over his head with a customer problem, plaintiff never did so despite the serious subsequent problems which have been described above. Mr. Lloyd Wilson, a black, was the office expert on the 5496 machine, on which plaintiff had great difficulty. He asked Palmer if he could, and he did, call Wilson on numerous occasions to help him with that machine. He testified that Wilson did in fact assist him on a number of customer calls, and spent a lot of time with him and that machine.

By December of 1977, however, it had become apparent to Palmer that plaintiff would not ask for technical assistance (except for Wilson and the 5496) despite his failure to improve. Palmer therefore, despite plaintiff's embarrassment, assigned Gus LeRoy, a "Technical Support Rep," to travel with plaintiff for several weeks. Palmer did not tell LeRoy that plaintiff was on an improvement program, but that he needed some help. Plaintiff testified that the presence of LeRoy during this period created greater problems among the customers, who immediately became doubtful and suspicious of his ability. In view of all that had transpired prior to December, 1977, the court is unable to credit that testimony.

When LeRoy made his subsequent report to Palmer, the final decision that plaintiff could not be improved appears to have been cast. LeRoy's testimony, accordingly, is highly significant. He had spent 18 years on I.B.M. hardware and, in the capacity of TSR, had the duty of assisting any CE with a technical problem, when called. Plaintiff had never called him, however, prior to this December, 1977 assignment by Palmer.

During the period that they travelled together, LeRoy testified that plaintiff challenged and questioned everything that he did; appeared to have no basic mechanical concepts; and would not follow either the maintenance manuals which accompanied every machine or use a process of logical deduction when diagnosing a problem. LeRoy testified, quite credibly, that he had not gone to training school on every machine himself (e. g. the 5496). However, logic and the concepts of circuits were basic to all of them, and permitted them all to be approached in the same manner, with the assistance of comprehensive manuals which were on-site with every machine and listed their specific tolerances and repair flow-charts. LeRoy told Palmer that plaintiff was without the basic skills needed for the job; that he was disorganized, lacked judgment, took fewer calls than even new CE's, made inappropriate remarks to customers, used his time uneconomically, making a long trip back to the branch to return a tool rather than taking calls, passing up an urgent call to make a vicinity call, and not acknowledging receipt of calls from dispatch or contacting the customer in distress, etc. LeRoy told Palmer that plaintiff's tools were in disrepair, that he was attempting to work with a non-functioning meter and disagreed with LeRoy's insistence that it was broken, and disagreed with LeRoy's methodical approach, in general. LeRoy's testimony, further, was that he had worked with Clarence Pompey, plaintiff's black replacement in that territory, and that Pompey was an excellent technician. He knew Pompey long before this December assignment with plaintiff.

Plaintiff substantially corroborated LeRoy's testimony as well. Even from the witness stand, plaintiff disagreed with LeRoy's methodical approach to a machine problem, and said that it was unnecessarily troublesome. He testified that LeRoy's method of "going to all the trouble of taking each part out" of the machine and testing its measurements was senseless, when one could just read the manual to find its measurements. To the court, that idea appears to be about as sensible as not bothering to

take a sick child's temperature because Spock's manual states 98.6° to be normal.

Plaintiff presented two customer witnesses who had no complaints against him. The facts remain, however, that many did, and that all of the events upon which they were based are essentially acknowledged to have occurred. Plaintiff's argument is simply that those events and patterns are no ground for complaint, either from the customers or from defendant I.B.M. The court finds, however, that the events of record clearly indicate that I.B.M.'s actions toward plaintiff up to and including his discharge were not based in whole or in part upon impermissible considerations of race, and do not constitute unlawfully disparate treatment.

Therefore, on the basis of these findings of fact and the conclusions of law stated above, plaintiff's complaint is hereby dismissed.